**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

**GERALD REYNOLDS,** as husband of **NIKI REYNOLDS,**

                              **Plaintiff,**                  3:12-cv-850
                                                                          (GLS)

                    v.

**CAROLYN W. COLVIN,** Acting Commissioner of Social Security,[1]

                              **Defendant.**
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **FOR THE PLAINTIFF:** | |
| Lachman, Gorton Law Firm<br>P.O. Box 89<br>1500 East Main Street<br>Endicott, NY 13761-0089 | PETER A. GORTON, ESQ. |
| **FOR THE DEFENDANT:** | |
| HON. RICHARD S. HARTUNIAN<br>United States Attorney<br>100 South Clinton Street<br>Syracuse, NY 13261 | ELIZABETH D. ROTHSTEIN<br>Special Assistant U.S. Attorney |
| Steven P. Conte<br>Regional Chief Counsel<br>Social Security Administration | |

---

[1] The Clerk is directed to substitute Carolyn W. Colvin, Acting Commissioner of Social Security, for defendant Michael Astrue, and amend the caption accordingly. *See* Fed. R. Civ. P. 25(d).

Office of General Counsel, Region II
26 Federal Plaza, Room 3904
New York, NY 10278

**Gary L. Sharpe**
**Chief Judge**

# MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff Gerald Reynolds, as husband of Niki Reynolds (hereinafter "claimant"), challenges the Commissioner of Social Security's denial of Disability Insurance Benefits (DIB),[2] seeking judicial review under 42 U.S.C. § 405(g). (*See* Compl., Dkt. No. 1.)[3] After reviewing the administrative record and carefully considering Reynold's arguments, the court affirms the Commissioner's decision and dismisses the Complaint.

## II. Background

On May 7, 2010, claimant filed an application for DIB under the Social Security Act ("the Act"), alleging disability since June 21, 2001.

---

[2] Because no application for Supplemental Security Income (SSI) appears in the record and it is otherwise clear that Reynold's request for review pertains only to claimant's application for DIB, the court ignores the mistaken reference to SSI in the complaint. (*See* Compl. ¶ 1, Dkt. No. 1.)

[3] By text-only order of December 18, 2012, the court granted claimant's motion to substitute Reynolds in her place.

2

(*See* Tr.[4] at 47, 96-97.) After her application was denied, (*see id.* at 48-51), claimant requested a hearing before an Administrative Law Judge (ALJ), which was held on March 24, 2011, (*see id.* at 20-46, 54). On April 12, 2011, the ALJ issued an unfavorable decision denying the requested benefits, which became the Commissioner's final determination upon the Social Security Administration Appeals Council's denial of review. (*See id.* at 1-19.)

Claimant commenced the present action by filing a Complaint on May 23, 2012 wherein she sought review of the Commissioner's determination. (*See generally* Compl.) The Commissioner filed an answer and a certified copy of the administrative transcript. (*See* Dkt. Nos. 8, 9.) Claimant died on November 22, 2012, while her appeal was pending before this court. (*See* Dkt. No. 13 at 2.) On December 18, 2012, Reynolds was substituted for claimant pursuant to 20 C.F.R. § 404.503(b). Each party, seeking judgment on the pleadings, filed a brief. (*See* Dkt. Nos. 12, 17.)

### III. **Contentions**

Reynolds contends that the Commissioner's decision is tainted by

---

[4] Page references preceded by "Tr." are to the Administrative Transcript. (*See* Dkt. No. 9.)

legal error and is not supported by substantial evidence. (*See* Dkt. No. 12 at 7-15.) Specifically, Reynolds claims that the ALJ improperly: (1) assessed the opinions of claimant's treating sources; (2) evaluated claimant's credibility; and (3) failed to consider all of claimant's severe impairments and their effects on claimant's ability to work, separately or in combination. (*See id.*) The Commissioner counters that the appropriate legal standards were used by the ALJ and her decision is also supported by substantial evidence. (*See* Dkt. No. 17 at 5-17.)

### IV. <u>Facts</u>

The court adopts the parties' undisputed factual recitations. (*See* Dkt. No. 12 at 2-7; Dkt. No. 17 at 1-2.)

### V. <u>Standard of Review</u>

The standard for reviewing the Commissioner's final decision under 42 U.S.C. § 405(g) is well established and will not be repeated here. For a full discussion of the standard and the five-step process by which the Commissioner evaluates whether a claimant is disabled under the Act, the court refers the parties to its previous decision in *Christiana v. Comm'r of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

## VI. Discussion

### A. Treating Physician Rule

First, Reynolds claims that the ALJ improperly assessed the retrospective opinions of claimant's treating sources. (*See* Dkt. No. 12 at 7-10.) Specifically, Reynolds argues that the opinions of treating physician Karen Hiester and treating orthopedist Matthew Bennett are uncontradicted and, thus, controlling. (*See id.*) The Commissioner counters, and the court agrees, that the ALJ properly discounted the opinions of Drs. Hiester and Bennett, as they were not treating physicians during the relevant time period and their opinions regarding the onset of claimant's limitations were inconsistent with the evidence of record. (*See* Dkt. No. 17 at 12-14.)

Controlling weight will be given to a treating source's opinion on the nature and severity of a claimant's impairments where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). Furthermore, "while a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical

evidence." *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003) (citations omitted). When a treating source's opinion is given less than controlling weight, the ALJ is required to consider the following factors: the length, nature and extent of the treatment relationship; the frequency of examination; evidentiary support offered; consistency with the record as a whole; and specialization of the examiner. 20 C.F.R. § 404.1527(c)(2)-(6).

    Here, the period of eligibility for claimant was from June 21, 2001, to June 30, 2006. (*See* Tr. at 10.) In January 1988, claimant injured her back in a work-related injury. (*See id.* at 332.) After sustaining her injury, claimant received some treatment, and the record contains treatment notes through June 1991. (*See id.* at 330-33.) In addition to her back problems, claimant was diagnosed with bilateral breast cancer in June 2001 and underwent bilateral mastectomies. (*See id.* at 212-14, 227-28, 301.) In February 2010, claimant met for the first time with Dr. Hiester. (*See id.* at 233.) Claimant reported "feeling well," and denied any musculoskeletal symptoms. (*Id.*) Upon examination, claimant's gait was normal, she had full range of motion in all of her extremities, and her reflexes were normal. (*See id.* at 233-35.) Thereafter, in May 2010, claimant complained of back pain that had been present for years, but had recently worsened. (*See id.*

at 237.)  At this time, the results of claimant's musculoskeletal and neurological examinations were largely benign.  (*See id.* at 238.)

In March 2011, Dr. Hiester opined that, due to her spinal pathology, claimant would be absent from work more than four days a month, and, during an eight hour workday, claimant would be able to sit for less than six hours, could not stand for two hours, and would need complete freedom to rest frequently.  (*See id.* at 342-44.)  According to Dr. Hiester, claimant could not lift any amount of weight and was severely limited in her ability to concentrate and sustain work pace.  (*See id.* at 343.)  Finally, Dr. Hiester opined that claimant would have suffered these limitations prior to June 2006.  (*See id.* at 344.)  The ALJ gave Dr. Hiester's opinion "little weight" because she did not begin treating claimant until 2010, and, moreover, her clinical findings did not support her opinion regarding the onset of claimant's limitations.  (*Id.* at 12-13.)

Claimant began treatment with Dr. Bennett in May 2010.  (*See id.* at 249.)  She complained of neck and back pain, explaining that her back pain had increased over the previous two to three years and become "unbearable" in the last two to three months.  (*Id.*)  At this time, Dr. Bennett noted that claimant's gait was normal, she did not use ambulatory aides,

7

and she suffered no muscle atrophy in her back, neck, or extremities. (*See id.* at 249-50.)  Further, claimant had no tenderness to palpation in her neck or back, and intact sensation in her extremities. (*See id.* at 250.) Seated and supine root testing was negative bilaterally. (*See id.*)  She had 4/5 strength in her left triceps and biceps, as well as her left tibialis anterior and extensor hallucis, but 5/5 strength in all other motor groups. (*See id.*) Claimant also suffered reduced range of motion in her neck and back, but full range of motion in her shoulders and hips. (*See id.*)  In addition, x-rays revealed degenerative changes at C5-6 and arthritic changes through the lumbar spine. (*See id.*)  Thereafter, Dr Bennett reviewed an MRI of claimant's cervical, thoracic, and lumbar spine and concluded that there was not significant thoracic or lumbar pathology, however, there was degenerative disc disease at C5-6 and C6-7 with disc osteophyte at both levels. (*See id.* at 252, 254-56.)

In March 2011, Dr. Bennett opined that, beginning some time prior to June 2006, claimant was limited to standing for two hours and sitting for less than six hours, in an eight-hour day, and required complete freedom to rest frequently. (*See id.* at 358-60.)  In Dr. Bennett's opinion, claimant would miss more than four days of work a month and could not lift any

amount of weight. (*See id.* at 358-59.) Dr. Bennett also opined that clamant's concentration and ability to sustain work pace were severely limited. (*See id.* at 259.) Dr. Bennett explained that his opinion was based on claimant's chronic back pain, disc herniation at C5-6 and C6-7, suspected double crush with involvement of the left ulnar nerve, and recurrent breast cancer. (*See id.* at 359.) The ALJ gave Dr. Bennett's opinion little weight because "he did not provide any explanation or medical basis for his opinion that these limitations manifested prior to June 2006." (*Id.* at 12.) Further, the ALJ noted that Dr. Bennett did not treat claimant until 2010, is an orthopedist who saw claimant due to her neck and back pain, and the record contains no diagnostic images or clinical findings prior to June 30, 2006 to support his opinion regarding the onset of claimant's limitations. (*See id.*)

Upon review of the ALJ's decision, the medical and non-medical evidence, and claimant's own testimony and submissions, it is clear that the ALJ accorded appropriate weight to the opinions of Drs. Hiester and Bennett. Contrary to Reynold 's contention that the ALJ gave the opinions limited weight due to their retrospectiveness, (*see* Dkt. No. 12 at 9), the ALJ limited the weight given to the opinions because of the nature and

9

extent of the physicians' treatment relationship with claimant, the fact that the opinions were not supported by the medical signs and findings from the relevant period, and the fact that the opinions were inconsistent with the other medical and non-medical evidence on record.  (*See id.* at 12-13); 20 C.F.R. § 404.1527(c)(2)-(4).

Dr. Hiester based her retrospective opinion on the fact that claimant's original injuries from 1988 continued to plague her.  (*See* Tr. at 344.) However, since the date of claimant's injury, she worked at the substantial gainful activity level for several years, only stopping when her employer eliminated her job.  (*See id.* at 11, 27-29, 100.)  Notably, there is very little medical evidence from the relevant period.  After her double mastectomy in 2001, claimant chose not to follow up with an oncologist because she did "not believe in management and follow-up . . . with the oncologist" and, instead, "hooked up with a naturopathic group."  (*Id.* at 218, *see id.* at 217.) In July 2001, it was noted that claimant's incision was well healed and her range of motion was good.  (*See id.* at 215-16.)  Treatment notes from October 2001 reveal that claimant was feeling fine and looking great with no complaints.  (*See id.* at 217.)  Thereafter, in January 2002, claimant complained of "some right inguinal pain and . . . intermittent back pain," but

10

she thought her symptoms were improving due to a change in her diet. (*Id.* at 198.) Examination results at this time were largely benign. (*See id.*) Claimant was sent for an MRI of her thoracic spine which revealed no evidence of metastasis but a small right disc protrusion at T6-7 and slightly larger disc protrusion at T7-8. (*See id.* at 203.) In June 2002, claimant's physical examination results were again benign, with claimant having normal range of motion in both arms, and it was recommended that she obtain a primary care physician. (*See id.* at 218.) However, claimant responded that she only wanted to pursue follow-up treatment in a naturopathic way. (*See id.*) The record contains no treatment notes from June 2002 until October 2008. At that time, claimant sought evaluation of a left chest wall nodule. (*See id.* at 220.) She did not complain of neck or back pain, was found to be pleasant and in no distress, and examination of the head, neck, and extremities was normal. (*See id.* at 220-21.)

Based on the above evidence, it was reasonable for the ALJ to infer that claimant's conditioned worsened, from 2006 until 2010, when she began treatment with Drs. Hiester and Bennett. Notably, "'[t]he opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops

11

place him in a unique position to make a complete and accurate diagnosis of his patient.'" *Arnone v. Bowen*, 882 F.2d 34, 40-41 (2d Cir. 1989) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n. 2 (2d Cir. 1983)). Here, Drs. Hiester and Bennett did not have an ongoing physician-treatment relationship with claimant during the relevant time period. Thus, the ALJ properly considered the nature of their treatment relationship in determining the weight she afforded to their respective opinions. (*See* Tr. at 12-13); *Arnone*, 882 F.2d at 41. Ultimately, the ALJ's decision to discount the opinions of Drs. Hiester and Bennett is supported by substantial evidence.

**B.      Credibility**

Next, Reynolds argues that the ALJ improperly evaluated claimant's credibility. (*See* Dkt. No. 12 at 10-14.) In particular, Reynold's claims that the ALJ failed to consider claimants stated reason for not obtaining treatment during the relevant time period, namely she lacked health insurance. (*See id.* at 14.) On the other hand, the Commissioner contends that the ALJ properly assessed claimant's credibility. (*See* Dkt. No. 17 at 14-17.) The court again agrees with the Commissioner.

Once the ALJ determines that a claimant suffers from a "medically

12

determinable impairment[] that could reasonably be expected to produce the [symptoms] alleged," she "must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's [subjective] contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." *Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010) (internal quotation marks and citations omitted). In performing this analysis, the ALJ "must consider the entire case record and give specific reasons for the weight given to the [claimant's] statements." SSR 96-7p, 61 Fed. Reg. 34,483, 34,485 (July 2, 1996). Specifically, in addition to the objective medical evidence, the ALJ must consider the following factors: "1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness, and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms." *F.S. v. Astrue*, No. 1:10-CV-444, 2012 WL 514944, at *19 (N.D.N.Y. Feb. 15, 2012) (citing 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi)).

Here, the ALJ determined that "claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms prior to June

13

30, 2006 [were] not entirely credible." (Tr. at 12.) The ALJ based her determination on the fact that the objective medical evidence did not support claimant's allegations. (*See id.*) In addition, the ALJ noted that after her mastectomy surgeries, claimant did not have adjunctive therapy and did not see her oncologist. (*See id.*) Further, in November 2008, when claimant's breast cancer returned and she was scheduled to have surgery to remove the tumor, she did not pursue the treatment. (*See id.* at 12, 222.) The ALJ also noted that claimant failed to seek treatment for her neck or back pain until 2010. (*See id.* at 12.) In addition, when first examined by Dr. Hiester in 2010, claimant reported feeling well and did not have any musculoskeletal symptoms. (*See id.* at 13, 233.)

Although Reynolds argues that a lack of insurance explains claimant's failure to obtain treatment during the relevant period, the record reflects that claimant chose not to pursue medical treatment due to, at least in part, her desire to pursue only "natural healing." (*Id.* at 284; *see id.* at 31-32, 217-19, 287.) "It is a natural inference that someone with an extremely painful physical impairment would not abstain from clinical treatment." *Cataneo v. Astrue*, No. 11-CV-2671, 2013 WL 1122626, at *20 (E.D.N.Y. Mar. 17, 2013)*.* In addition to the lack of treatment, the medical

14

reports in the record similarly belie Reynold's contention that claimant could not perform less than the full range of light work during the relevant period. For example, treatment notes from October 2001 state that claimant was feeling fine, looking great, and had no complaints. (*See* Tr. at 217.) On January 2002, claimant complained of "intermittent back pain" that she thought was improving with a change in diet. (*Id.* at 198.) In June 2002, claimant reported that she was unaware of any particular abnormality in terms of palpable masses or any significant bone pain. (*See id.* at 218.) Claimant testified at the administrative hearing, in March 2011, that her physical condition, and her back impairment in particular, was unchanged since 2006. (*See id.* at 29-31.) However, in May 2010, almost four years after claimant's date last insured, claimant began treatment with Dr. Bennett and complained of back pain that had increased in the last two to three years and become "unbearable" in the previous two to three months. (*Id.* at 315.) Based on this evidence, the court concludes that the ALJ properly weighed "the objective medical evidence in the record, [claimant's] demeanor, and other indicia of credibility." *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (internal quotation marks and citation omitted). Thus, there is no reason to disturb the ALJ's

15

credibility assessment.

## C. <u>Severity Determination</u>

Finally, Reynolds contends that the ALJ failed to consider all of claimant's severe impairments and their effect upon her ability to work, separately or in combination. (*See* Dkt. No. 12 at 14-15.) According to Reynolds, the ALJ erred in failing to find claimant's lumbar and cervical problems to be severe impairments. (*See id.*) The court disagrees.

For an impairment or combination of impairments to be deemed "severe," it must "significantly limit[]" claimant's "physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). To meet the duration requirement, an impairment must last, or be expected to last, for a continuous period of at least twelve months. *See id.* § 404.1509. A finding of non-severity results where a claimant suffers "only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on [her] ability to work." *Christiana*, 2008 WL 759076, at *4 (internal quotation marks and citation omitted). The term "basic work activities" refers to "the abilities and aptitudes necessary to do most jobs," including functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. § 404.1521(b).

16

Here, there is no evidence that claimant's neck or back impairment "significantly" inhibited her ability to do basic work activities, during the relevant time period. 20 C.F.R. § 404.1520(c). In fact, as the Commissioner notes, "the medical evidence during the relevant period . . . was largely devoid of musculoskeletal complaints or exam findings." (Dkt. No. 17 at 5.) As noted by the ALJ, after her 1988 back injury, claimant worked at the substantial gainful activity level. (*See* Tr. at 11.) Moreover, in making her residual functional capacity (RFC) determination, the ALJ considered claimant's back injury, including evidence from and the opinions of her treating orthopedist and primary care physician. (*See id.* at 12-13.) As the disability analysis continued and the ALJ considered claimant's severe and non-severe impairments in her RFC determination, any error at step two is, at most, harmless. *See Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952, at *4 (N.D.N.Y. Feb. 7, 2012); *see also Plante v. Astrue*, No. 2:11-CV-77, 2011 WL 6180049, at *4 (D. Vt. Dec. 13, 2011).

**D.     Remaining Findings and Conclusions**

After careful review of the record, the court affirms the remainder of the ALJ's decision as it is supported by substantial evidence.

**VII.  Conclusion**

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the Clerk is directed to substitute Carolyn W. Colvin, Acting Commissioner of Social Security, for defendant Michael Astrue, and amend the caption accordingly; and it is further

**ORDERED** that the decision of the Commissioner is **AFFIRMED** and Reynold's Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case and provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

June 18, 2013
Albany, New York

_Gary L. Sharpe_
Gary L. Sharpe
Chief Judge
U.S. District Court